**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 03-2714

GULF 95, INC.,
Plaintiff, Appellee,

v.

ROGER LARIVIERE,
Defendant, Third-Party Plaintiff, Appellant,

v.

MANDI SARDI
Third-Party Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Ernest C. Torres, U.S. District Judge]

Before

Torruella, Lipez and Howard, Circuit Judges.

Christopher M. Mulhearn, with whom W. Mark Russo and Ferrucci
Russo P.C. were on brief, for appellant.
Joseph J. Brodigan, P.C., with whom Brodigan and Gardiner,
Louis V. Jackvony, Jr. and Jackvony & Jackvony were on brief, for
appellees.

February 3, 2005

**Per Curiam**.  Gulf 95, Inc. sued Roger Lariviere in Rhode Island superior court alleging that he had converted, for his own use and benefit, certain valuable property.  Following removal on diversity grounds, Lariviere filed an answer and third-party complaint against Nandy Sarda[1], the sole owner of Gulf, alleging breach of contract and seeking indemnification and contribution.  Following a bench trial, the district court found in favor of Gulf on its conversion claim and rejected Lariviere's claims.  The court entered judgment against Lariviere in the amount of $164,133.33, plus interest.  Lariviere brings this appeal to challenge the sufficiency of the evidence supporting the court's damages award.

In the mid-1980s, Gulf purchased a number of steel and aluminum truss assembly systems for use in the construction of concrete buildings in Florida.  Each system is composed of either steel or aluminum trusses and component parts that allow the trusses to be assembled into forms.  When assembled, these forms permit a contractor to pour concrete decks on each level of a building under construction.  After completion of each floor, the forms can be moved up to the next floor with a crane.  These so-called "flying forms" eliminate the need to construct concrete forms at each level and thus increase the speed of construction

---

[1]The third-party defendant, appellee, appears on the district court docket, and on our own docket, as "Mandi Sardi."  For the purposes of this opinion, however, we adopt the spelling of appellee's name reflected in the trial transcript and in appellees' brief, "Nandy Sarda."

while lessening the cost.  As a result, truss assembly systems can be quite valuable.

Gulf used its truss assembly systems to build approximately 20 high-rise buildings during a five year period in the late 1980s.  After Gulf discontinued its Florida construction operation, the systems were removed, first to a storage site in Massachusetts, and subsequently to a site in Rhode Island owned by the Flexicore Corporation, a manufacturer of precast concrete slabs that, like Gulf, is wholly owned by Nandy Sarda.  The systems were stacked on pallets along the rear fence line of the Flexicore property and were never again used by Gulf or Flexicore.  Nandy Sarda's nephew, Anthony Sarda, prepared a written inventory of the truss systems when they arrived at the Flexicore plant in early 1991.  Included on that inventory were 910 steel trusses, 244 aluminum trusses, and the necessary component parts (also referred to as accessories).  Nandy Sarda's secretary subsequently printed an official version of the inventory for record-keeping purposes.

In 1996, Anthony Sarda hired Lariviere as an independent contractor to perform maintenance on forklifts and other equipment at the Flexicore plant.  Before Anthony Sarda left Flexicore in September 1998, he undertook a second inventory of the truss assembly systems.  This second count (which was not reduced to writing) confirmed that the 1991 inventory was still accurate.

As Flexicore's operations wound down in the late 1990s, Lariviere's duties gradually transformed from that of repairman to that of caretaker. By 1999, Lariviere assumed the role of the primary caretaker of the plant and was given access to the entire facility. That same year, Nandy Sarda put the plant up for sale. Sarda's real estate agent suggested that, in order to facilitate a sale, the large amount of debris and equipment scattered across the property be cleared.

At this point the litigants' stories diverge. Lariviere claims that Nandy Sarda instructed him to clear the property of all debris, including the truss assembly systems, and that he and Sarda agreed that he could retain the proceeds from the sale of any material he could sell for scrap. Sarda admits that he did endeavor to clear the site of debris, but denies having given Lariviere authority to scrap or sell any of the systems. To the contrary, Sarda contends that he told Lariviere on multiple occasions that the systems were valuable and should not be sold or scrapped.

Regardless, Lariviere made arrangements to begin removing the truss assembly systems from the property in late spring of 2000. He sold the steel trusses to two scrap metal companies and many of the aluminum trusses to independent scrap collectors. Lariviere collected approximately $10,500 for his efforts. Sarda, who was living in Nevada at the time, was unaware of these

transactions. Lariviere completed the clean-up of the site in December 2000. By this time, all that remained of the truss assembly systems were 30 aluminum trusses.

In the spring of 2001, Brooks Miner, a broker of concrete forms and related construction equipment, contacted Sarda about purchasing Sarda's truss assembly systems. Although Sarda previously had rebuffed similar overtures from Miner, he agreed this time to negotiate a sale and forwarded to Miner the 1991 inventory. Based on the inventory, Miner gave Sarda an estimated quote, see infra note 3, and then traveled to the Flexicore plant to inspect the systems himself. When he arrived, he found that only 30 aluminum trusses remained. Miner reported to Sarda his disappointment that most of the systems on the inventory were missing. He did, however, agree to purchase the 30 aluminum trusses for $9,200.[2]

Sarda was surprised to learn that the truss assembly systems were missing and immediately traveled to Rhode Island to inspect the site himself. When Sarda confronted Lariviere in person, Lariviere acknowledged that he had sold many of the systems' components to various third parties. Sarda and Lariviere attempted to retrieve the systems from those third parties but were

---

[2]There was conflicting testimony as to whether Miner paid $9,200 or $9,270 for the 30 aluminum trusses. But because Lariviere does not contest the issue, we adopt the $9,200 figure found by the district court.

unsuccessful. This lawsuit ensued and was tried to the district court, which concluded that Sarda did not authorize Lariviere to scrap the systems; that the trusses were in complete and marketable condition at the time that they were scrapped; and that the fair market value of the systems at the time they were converted was $173,333.33.[3] The court subtracted from that sum the $9,200 that Gulf had received from Miner for the 30 aluminum trusses and entered judgment for Gulf in the amount of $164,133.33, plus interest.

_____

[3]The district court's market value calculation was based upon the testimony of Miner. Having been in the business of buying and selling similar systems for 43 years Miner was competent to testify as to market value. He testified that it is customary to pay a percentage of the original purchase price, or list price, when buying a used truss assembly system, the discount depending on the condition of the equipment and the completeness of the set (i.e., whether the system has all of its component parts). Before he traveled to Rhode Island to inspect Gulf's equipment personally, Miner quoted Sarda an estimate of 30 percent of the list price for the systems reflected on the 1991 inventory. Miner testified that this 30 percent estimate represented the median of the standard value range (20 to 40 percent) for truss assembly systems of that age. His 30 percent estimate was based on dual assumptions that Gulf's systems included a complete set of accessories, and that they were in average condition for systems of their age. According to Miner, 30 percent of the list price yielded a range of between $260,000 and $300,000 for the entire set of Gulf's systems.

Finding that the trusses had some surface rust, and that the accessories were not in good condition, the district court declined to use Miner's median estimate of 30 percent of the list price for its fair market value calculation. Rather, the court based its calculation on the low end of the standard range Miner had mentioned in his testimony: 20 percent of the list price. Twenty percent of the list price yielded a range of $173,333 to $200,000. Again, acknowledging the poor condition of the accessories, the court selected the low end of that range, $173,333, as representing Gulf's damages.

Lariviere's only developed argument on appeal is that the evidence did not support the district court's conclusion as to the fair market value of the truss assembly systems at the time they were converted in 2000. In pressing this argument, Lariviere makes two subsidiary assertions about the state of the evidence before the court: first, that the 1991 inventory provides the only credible evidence concerning the number of components in the systems, but that the 1991 inventory is too far removed to constitute probative evidence of the completeness of the systems at the time of conversion (in 2000); and second, that there was no evidence concerning the quality and/or condition of the systems at the time of conversion. Because of these evidentiary gaps, Lariviere contends, the court had no basis for concluding that the systems had any value beyond their scrap value (established to be approximately $10,500) at the time they were converted.

Lariviere's appeal is built on too stingy a reading of the record. While it is true that the 1991 inventory provides the only <u>documentary</u> evidence in the record concerning the number of components in Gulf's truss assembly systems, there was no shortage of <u>testimonial</u> evidence on this issue. This testimonial evidence, found credible by the court, was sufficient to ground the judgment entered. <u>See</u> Fed. R. Civ. P. 52(a) (factual determinations made at a bench trial "shall not be set aside unless clearly erroneous"); <u>United States</u> v. <u>15 Bosworth St.</u>, 236 F.3d 50, 53 (1st Cir. 2001).

-7-

It was not clearly erroneous for the court to credit Anthony Sarda's testimony that his 1998 recount confirmed that all of Gulf's systems were still present on the property at that time. Nor did the court clearly err in choosing to credit Nandy Sarda's testimony that he did not observe any changes to the stacks of equipment during any of his visits to the plant throughout the 1990s. In sum, although Gulf did not provide the court with a written year 2000 inventory, there is no reason for us to question the court's determination that the systems remained complete up until the time they were converted.

So too with the court's determination that the systems were of marketable quality. On this point, the court reasonably credited testimony that Gulf stored the trusses in the customary manner: the steel trusses were treated with baked-on paint to avoid rusting (the aluminum trusses were not painted because aluminum does not rust) and were stacked on pallets to elevate them from the ground. There was credible testimony that trusses are customarily stored outside because of their size and because the weather does not ordinarily affect their condition when they are painted and stacked properly. The court also reasonably credited the testimony of several witnesses, including the caretaker of the premises before Lariviere assumed the job in 1999, who testified that the trusses (though not the accessories) appeared to be in

good condition at various times as late as 1999.[4]  Although the court did conclude that the accessories had acquired significant rust due to improper storage, the court did not find that the accessories were non-functional.  Nor did the evidence compel such a finding.  Thus, we see no clear error in the line that the court chose to draw:  that the systems were in marketable condition, but because the accessories (an important component of the systems) were significantly rusted, only at a price at the lowest end of the range in which systems of that age ordinarily sell.  See supra note 3.

**Affirmed**.

---

[4]These witnesses testified that, to the extent that rust was observed on the trusses, it was only surface rust, which the court reasonably accepted as being insignificant to the trusses' value.